[Civ. No. 269.   Third Appellate District.—December 10, 1906.]

## MRS. MILDRED D. GEAR, Respondent, v. MRS. M. A. FORD, Appellant.

MINING CLAIMS—FORFEITURE—FAILURE TO DO ANNUAL WORK—BURDEN OF PROOF.—The right of the locator of a mining claim who has made a valid location thereof continues, independently of actual possession thereof, until he has abandoned the same or forfeited it by failure to do the requisite annual work thereupon; and the burden of proof is upon a subsequent locator to show either an abandonment or a forfeiture of the claim, by clear and convincing proof.

ID.—QUESTIONS OF FACT—FORFEITURE—PURPOSE AND ADAPTATION OF WORK.—Whether a prior location was forfeited as against an adverse location, and whether work was done for the purpose of working the claim in controversy, or was adapted to that purpose, are questions of fact.

ID.—SERVICES OF A WATCHMAN NOT ALLOWABLE UPON ANNUAL WORK— AMOUNT OF ANNUAL WORK DISPROVED.—*Held*, that, under the facts of this case, as disclosed by the evidence, the services of a watchman were not allowable upon the annual development work required by the statute; and that, apart from such services, the required amount of annual work was disproved, and the evidence is sufficient to sustain the findings for the plaintiff, as subsequent locator.

APPEAL from a judgment of the Superior Court of Mariposa County, and from an order denying a new trial. J. J. Trabucco, Judge.

The facts are stated in the opinion of the court.

F. W. Street, for Appellant.

H. L. Gear, and George D. Gear, for Respondent.

CHIPMAN, P. J.—Action to quiet title to a quartz mining claim situated in the county of Mariposa. The claim was originally located in 1879 and in 1893 came into the ownership and possession of defendant by mesne conveyances. The cause was tried by the court and it found: "That during the year 1903 . . . there was not one hundred dollars' worth of labor performed or improvements made upon the mine by the defendant; that in 1904 defendant did not resume mining work upon said claim, or cause mining or labor to be resumed or make improvements thereon prior to January 16, 1904," on which day the court found that the land was vacant public mineral land of the United States, subject to location, and that on said day plaintiff entered upon the land and located the same as required by law. No question arises as to the validity of this latter location if the land was subject thereto. Judgment passed for plaintiff, from which and from the order denying her motion for a new trial defendant appeals.

The question of abandonment of the mine by defendant is not raised by pleading or by evidence. The sole question presented by defendant is that the evidence is insufficient to justify the finding as to the work done by her on the mine in 1903 and the resumption of work in January, 1904.

The evidence was that subsequent to February, 1898, no work was done in the way of substantial improvement or development of the mine, except that some work of the value of about $45 was done by parties having a bond on the mine in 1900. Considerable money had been expended in development work up to 1898. At that time a shaft had been sunk and a house erected over it; there were near by two small houses or cabins—a one-room and a two-room house used for dwellings; the house over the shaft contained an old threshing engine used for power, which cost when placed there $300, a hoisting apparatus, pumping gear, some mining tools and blacksmith's forge. But these tools and the forge, all the three-inch pipe and suction hose, the mortar, mine bell and the belting had been taken away prior to 1903; the hoisting

apparatus and pumping gear had been dismantled and all that remained in use of the hoisting apparatus was the windlass and the rope and bucket used by the man left in charge to draw water from the partly filled shaft for his personal use. The buildings were cheaply constructed, of not much value, and in 1903 had become quite dilapidated, though with slight repairs would have furnished shelter for workmen. One Corey was sent to the mine at defendant's instance by her brother in 1894. Corey testified: "I was looking after the property there, for the owners of the property, Mrs. Ford, or whoever had charge of it. I never did any mining there except prospecting with a pan, pick and shovel around in the various places upon the mine outside of the mine and anywhere on the ranch." It appeared that defendant bought the mine as part of a six hundred acre ranch on which were some livestock, gardens and orchards, the land mostly being suitable only for pasture. The gardens were partly on the mine and partly outside its boundaries, as were also the orchards. Corey remained there until the latter part of June, 1903. He was a tinsmith by trade, in poor health, and was not familiar with quartz mining. He testified: "It [his health] was not good. I was able to do work about the house getting my food and getting my meals and getting my wood and other work that had to be done appertaining to housekeeping, but I couldn't do much else. I would state that I did work in the garden, such as making ditches and getting water to irrigate and that sort of work, but that was all I was able to do. That was all I did do in 1903." He was taken to the county hospital sick in the latter part of June. He testified: "The last work done on that mine by miners, according to my recollection, was about five years ago. That work was done by a company. Mr. Woodside . . . I can't recollect the names of all the partners. . . . I can't tell the nature of the work they did at that time because they were working underground. I didn't go underground at all. I didn't have any agreement with Mrs. Ford or Mr. Woodside as to what compensation I was to receive when I went on that property. Mr. Woodside said they wanted a man there to look after property around there, see that it wasn't lugged off. My principal work was done in the two, orchard and garden. . . . According to my under-

standing all of the upper garden, excepting one orange tree, was on the claim. The other garden was. off the claim about one hundred yards more or less distant. I didn't perform any mining work in 1903 on that mine.'' He was paid for his work no stated compensation, but testified that he was paid ''in cash, produce and stores. I didn't receive in one year for the work or labor done on that mine, for either Mr. Woodside or Mrs. Ford, or both of them as much as $75 in money, labor, clothes or anything else.'' On cross-examination he testified: ''While I was looking after that property I did prospecting—I did not know the boundaries of the claim. I would say that I did not do very much prospecting. . . . I prospected wherever I thought there was a chance of getting gold on the mine or off the mine or off the ranch. There is a quartz lead running through that section where I was living but is not on the mine. It is on the hill outside of the mine, but no quartz lead cropping out on the mine that I know of. I wasn't prospecting for any vein. I was prospecting for surface gold. The most prospecting I did was in the creeks and gulches. I was prospecting mostly for placer gold. I sometimes took a pan out from off the mine and different places.'' He was asked if from January 1st to the time he left in June, 1903, his duties were the same as they had been and answered: ''Yes, sir; the orchard, the garden and so forth. I done the most of the work on the garden irrigating and the ditches to carry water. I was still looking after the property that was in the engine-house and at the hoist. I had the key to the building—I looked at them—I was there. I was looking after the property to see that no one stole it.'' Again he said: ''I didn't do any mining or prospecting from the 1st of January, 1903, up to the last of June, 1903. I wasn't well. All I could do was to look after the irrigation. I looked after the buildings and improvements and I lived on the mine.'' It appeared from the testimony of Mrs. Ford that she paid Corey $18 in cash and his store bill, $36; in all $54 for his labor in 1903 to the end of June. Mr. Woodside (defendant's brother) placed one Varian in charge of the property when Corey left and gave him the key to the engine-house. Varian lived about a half a mile distant from the mine and for the month of July, 1903, looked after the property, but did no work on it.

He testified that he was not there every day and sometimes he "sent the boy." For his services for the month he was paid $10. He then put one Gabriel Ferola in charge. He testified: "I told Gabriel to mine there and stay there until he got further orders from Mr. Woodside or Mrs. Ford. I told him to look after everything that was on the mine." Varian retained the keys to such buildings as were under lock and the others were fastened up. Gabriel lived on the Prouty place a mile and a half away from the mine. No agreement was made as to his compensation, but he testified that he went back and forth daily, except Sundays and holidays, to and from the mine in discharge of his duties, except also two or three days when he worked for a neighbor, until January 17, 1904, and then for the first time Varian delivered to him the keys to the buildings. This was the day after plaintiff's relocation of the mine. He testified that defendant paid him in April, 1904, $80 for eight months' work to January 1st, at the rate of $10 per month. He testified that he prospected on the mine with pick and shovel and pan, taking out in eight months $30 or $40; that he worked to see if he "could find a vein in some lead or something"; that Varian told him to prospect wherever he wanted to and whatever gold he got to keep it and look after the buildings. He testified: "I didn't work all the time around the mine. I worked in the gulches and other places where there was water"; that most of the time he "got the rock or dirt right from the creek in front of the mine"; he "didn't get it away from the mine, from some other places"; that sometimes he "watered the trees so they would not be dry." Again he testified: "I did not do any other kind of mining than placer mining or crevicing. I can't do it. I am not able." It was testified to by several witnesses that Gabriel told them on January 16, 1904, "that he did not work on the mine and that no one else did any work there for three years." This he denied. He testified that the work done by him after January 1st to January 16th was similar to the work he had done in 1903. Nothing in the way of resumptive work was done by defendant except by Gabriel Ferola. There was considerable testimony given by persons who were familiar with the property, or who were mining experts, to the effect that in January, 1904, the mine showed no evidence of having been prospected or

worked or improved in any way, either in or about the old workings or elsewhere, and that the buildings had not been repaired or improved for several years. The evidence showed that the buildings had become dilapidated, the foundations insecure from decay, that the engine was badly rusted, and that the little remaining personal property was of small value and not of a character likely to be stolen or carried away, and could readily have been removed to a place of safety. There was some evidence that the buildings might have been destroyed had a forest fire reached them, and that a watchman, if present, could have prevented it had such danger threatened. No such fire occurred, however. There was considerable testimony which has not been adverted to tending to support the findings, although not entirely without conflict. But we think sufficient has been pointed out to justify the conclusions of the court when the evidence is viewed in the light of settled rules of law and when applied to the United States mining statutes subject to those rules.

The following are some of the principles above adverted to: After a valid location has been made the locator need not keep actual possession of the claim. His right of possession would continue until he has in fact abandoned it, or has forfeited it by failure to do the requisite amount of work within the prescribed time, and the burden of proving such forfeiture or abandonment is on him who would attack this right. (*Quigley* v. *Gillett,* 101 Cal. 462, [35 Pac. 1040]; *Harris* v. *Kellogg,* 117 Cal. 484, [49 Pac. 708].) If the work was actually done in good faith for the purpose of developing the mine, the strict compliance with the requisites of the statute is established, and a court will not be permitted to substitute its own judgment as to the wisdom and expediency of the method employed for developing the mine in place of the owner. (*Mann* v. *Budlong,* 129 Cal. 577, [62 Pac. 120]; *Wright* v. *Killian,* 132 Cal. 56, [62 Pac. 120].) The courts are reluctant to enforce forfeitures, deeming this class of penalties odious in law; and it is well settled by decisions that forfeiture cannot be established except upon clear and convincing proof of the failure of the former owner to have performed the labor to the amount required by law, the burden of proving which rests upon the party asserting it. (*Emerson* v. *McWhirter,* 133 Cal. 510, [65 Pac. 1036].)

Whether a prior location was forfeited, as against another adverse location, and whether work was done for the purpose of working the claim in controversy, or was adapted to that purpose, are questions of fact. (*Taylor* v. *Middleton,* 67 Cal. 656, [8 Pac. 436]; *Altoono Q. M. Co.* v. *Integral Q. M. Co.,* 114 Cal. 100-107, [45 Pac. 1047].) The claim of defendant made in her briefs is not that there was any failure on the part of the plaintiff to submit evidence bearing directly upon the question of forfeiture, but that the court drew wrong conclusions from the evidence. In support of her contention defendant places much reliance on the claim that the time and money expended for the watchmen Corey, Varian and Ferola *as watchmen,* irrespective of any mining done by them, must be considered as falling within the purview of section 2324, Revised Statutes of the United States, [U. S. Comp. Stats. 1901, p. 1426], requiring that "not less than one hundred dollars' worth of labor shall be performed or improvements made during each year." Upon this feature of the case we are cited to *Altoona Q. M. Co.* v. *Integral Q. M. Co.,* 114 Cal. 100, [45 Pac. 1047], and *Hough* v. *Hunt,* 138 Cal. 142, [94 Am. St. Rep. 17, 70 Pac. 1059]. As the services of these men as watchmen have much to do with the point strenuously urged by defendant, the cases just cited should be examined in this sequence. The opinions in both of these cases were written by Mr. Justice Temple. The first-mentioned case was a bank decision and in the second rehearing was denied. Taken together, they come as near furnishing a guide to a right conclusion in the present case as may· be found in our reports. The importance of the question in the present instance calls for a full statement of what was said in the cases cited.

In the Altoona case "the jury were told that it [work upon a mine in order to hold it] might consist in digging, etc., 'or, if the mine lie idle, it may consist of the services of a watchman or custodian in looking after the property and taking care of the same.' " Speaking of this the court said: "To constitute a general rule this would require some qualifications. If this sort of care was necessary to preserve tunnels, buildings, or any structures erected to work the mine, and which would be necessary in case work were resumed, we see no reason why it would not constitute work upon the mine as much as the erection of such structures in the first

instance would. But if there was only the naked claim to be looked after, and a watchman were placed there merely to warn prospectors, and thus prevent a relocation, it would not be labor upon the mine within the sense of the statute. As applied to the facts of this case the instruction was not injurious, for it was not disputed that there were reduction works, houses, and barns, as well as tunnels and pits to be looked after.''

*Hough* v. *Hunt, supra,* was a contest for a mining claim. Plaintiffs had been in possession several years of a quartz mining claim and had expended about $1,100 in developing the mine. They sunk a shaft upon the supposed lode some twenty-five feet, put up a winze, etc., and built a shed over their shaft. In 1898, according to the findings of the court, they performed only $25 worth of work toward working and developing the mine, and early in January, 1899, defendants entered upon the mine and relocated it as vacant ground. No claim was made that the mine had been abandoned, the sole claim being that plaintiffs had forfeited their rights by failure to do the requisite amount of work in 1898. The contention that the finding was not supported by the evidence, said the court, ''depends entirely upon the fact that plaintiffs owned a house within the boundaries of the location and employed some one to live in it and paid such person $45 per month. It is claimed that such persons at least took care of the property on the mine. It is not shown that he was employed to do anything of the kind; but if that had been shown the conclusion of the trial court is eminently sound, that such watching was not required and was not work on the mine. The cases must be rare in which it can justly be said that such money is expended in prospecting or working the mine. There may be cases where work has been temporarily suspended, and there are structures which are likely to be lost if not cared for, and it appears that the structures will be required when work is resumed. and that the parties do intend to resume work, in which money expended to preserve such structures will be on the same basis as money expended to create them anew. But this could not go on indefinitely. As soon as it should appear that this was done merely to comply with the law and to hold the property without any intent to make use of such structures within a reasonable period, such expenditure could

not be said to have been made in work upon the mine. Much less could the mine owner bring picks, shovels and things of that kind upon the mine, and have someone watch them to prevent their being stolen, and have such cost of watching considered as work upon the mine.''

In the case here the suspension of actual development work took place in 1898. The little work done in 1900 was hardly sufficient to break the continuity of this suspension. But assuming that work was suspended in 1900 it could hardly be said to be ''temporary'' in the sense that word is used in the above opinion. Nor can it be said that the suspension was with the intention of renewing work within a reasonable time or that there was any intention to use the buildings, for the purposes for which they were constructed, within a reasonable time, for they were never after 1900 so used and the claim was relocated four years afterward.

Defendant does not claim, nor could she in view of the evidence, that the requisite work was done in the year 1903, without classing the work of watching the building and their contents as the work contemplated by the statute. The testimony is sufficient to show that the compensation paid the watchman was for looking after the property. In our opinion the court drew correct conclusions from the evidence and that the finding as to work and labor performed in 1903 is amply supported. The work of Ferola in January, 1904, was the same as in the latter part of 1903, and was not, in our opinion, such work as constituted ''labor performed or improvements made'' on the mine, and we think that the court correctly found that work was not resumed or improvements on the mine made by defendant in 1904, prior to plaintiff's location. Witness Packer, a mining engineer, and deputy United States surveyor, went to the mine with plaintiff and some other persons early on the morning of January 16, 1904, to assist in locating the mine. About an hour after their arrival Ferola came to the mine. Packer testified: ''I asked him where he was going. He said he was going over the claim. I asked him if he was working on the claim. He said no. I asked him what he was doing and he said he came over there to look and see if it was being jumped or not. Went back every day. I asked him if any assessment work had been done upon the claim to his knowledge. He said no—that none had been done. I asked him several times

and Mrs. Gear also asked him in my presence, in Miss Miller's presence, if any work had been done or not, or improvements had been made. He stated positively that there had not. He spoke intelligent English. I was fully able to comprehend everything that he said. I spoke with him in broken Spanish also. I speak Spanish slightly. He told me he was there representing the interests of Mrs. Ford." Ferola was to some extent discredited and the court may have disbelieved, as it had the right to do, some of his statements tending to show that he was prospecting and working on the mine some of the time he was there.

The written opinion of the court, appended to defendant's brief, shows that the learned judge gave the case very careful study before deciding it. He said: "I have examined the testimony in this case with great care and am forced to the conclusion that defendant has failed to comply with the law and that when plaintiff made her location the ground was open to relocation."

In this view of the evidence we concur.

The judgment and order are affirmed.

Buckles, J., concurred.

McLaughlin, J., concurred in the judgment.