[Civil No. 3253. Filed October 23, 1933.]

[25 Pac. (2d) 1026.]

W. M. JAMES, Appellant, v. CARL G. KROOK, as Administrator of the Estate of ALBERT W. CRAWFORD, Deceased, Appellee.

Mr. E. Elmo Bollinger, for Appellant.

Mr. Carl G. Krook, *in pro. per.*

ROSS, C. J.—This action was brought by appellant, James, to quiet his title to the Gilpin group of seven mining claims, located in Mohave county, and consisting of the Water Witch and Gilpin Nos. 1 to 6, both inclusive. The ground covered by his locations, at the time they were made and for a number of years theretofore, was known as the Times group of mining claims, consisting of the Black and White, Times, Times No. 2, La Paz No. 2, Bendigo Fraction, Red Top and Big Four; and, unless forfeited for failure to do the necessary annual representation work or improvement for the year ending at 12 M., July 1, 1931, belonged to the appellee, Carl G. Krook, as administrator of the estate of Albert W. Crawford.

At the trial there was only one question considered, and that was as to whether the Crawford estate had done, or caused to be done, during such year $100 worth of labor or improvements upon or for each of the locations in the Times group. The court heard the evidence and decided the necessary expenditure and outlay had been made on all of the claims in the Times group, except the Big Four. The title was

quieted to the other six in the appellee administrator; and the title to the Water Witch, which covers the Big Four ground, was quieted in appellant. The Big Four was not given credit for any of the annual labor, for the reason that it is noncontiguous and not benefited.

. During the assessment year in question, and the years 1929 and 1930, the Times group was under a lease and option to one Patrick Brady and a company associated with him, and whatever was done in the way of work and improvements on said group was at the instance and under the supervision of Brady. In 1929 he retimbered a shaft on the Times claim down to the 164-foot level, but, the depression coming on, he was unable to sell the stock of his company, and consequently could not perform the option or proceed with the development. Mining was suspended, but the option was extended and he left in possession.

Patrick Brady lived in Glendale, California, and he employed a son, P. H. Brady, who resided at Oatman, Arizona, to look after the Times group. Testifying, P. H. Brady said that what he did in the way of work was that, if in traveling over the road he saw a rock in it, he would take it out and refill washed-out places; admitted he had not done as much as a half day's road work on mines or for their benefit at any one time. There was no evidence that anybody else had done any road work. The Tom Reed mine where the son worked was about two to three miles as the crow flies and six miles as an automobile travels from the Times group. The son testified that he worked a shift every day, including Sunday, in the mill of the Tom Reed mine. He said:

"Well, I really never kept track of the number of times I went out, or number of times a week, but I would go out simply occasionally, perhaps sometimes two times a week, sometimes three times a week, sometimes once a week. It would depend on how I

felt or how the job was going over at the mill. When I happened to be on graveyard shift, I wouldn't go out as often as when I wasn't working graveyard."

In answer to a question by the court as to why he visited the Times group, or as to the necessity of his doing so, he said:

"I just simply went when I happened to feel good and felt like getting out. There are really few places to go and as long as I had this job, I would go out there instead of taking a drive. The buildings were locked and I kept the key, and they were at all times locked."

In another place he testified there were no tools, loose pipe or personal stuff that could be stolen; that he had picked up most of the small things or had taken them away.

There were corrugated iron and frame buildings and mining machinery of various kinds, such as hoists, cables, air-compressors, etc., on the mines which were by the appraisers of the Crawford estate valued at about $2,600. One of the appraisers testified that the machinery was "in good condition. . . . Under lock and key, yes, in good order." The mines had not been operated for a number of years, and whether Brady and his company would resume development depended altogether upon their ability to sell stock of the company.

There was evidence of an expenditure of around $900, including $600 paid to the son, P. H. Brady, as watchman, and $50 paid for gasoline for auto used by him in making trips from the Tom Reed mine to the Times group. If the item of $650 paid as watchman's wages and expenses be counted as annual work, the Times group was not open to location on July 1, 1931; but, if it is not counted, the group was open to location.

The annual assessment of $100 on each unpatented mining claim required by section 2324 of the United

States Revised Statutes (section 28 of title 30, U. S. C. A.) was evidently intended to be spent in sinking holes or shafts or in running tunnels or drifts therein to discover or locate ore bodies, or in the installation of machinery or fixtures to facilitate the extraction therefrom of any ores that might be found. *Lockhart* v. *Rollins,* 2 Idaho (Hasb.) 540, 21 Pac. 413. Labor or improvements that tend to develop the claim and facilitate the extraction of the minerals and the valuable content therefrom may be applied to annual work. Snyder on Mines, § 498; *Golden Giant Min. Co.* v. *Hill,* 27 N. M. 124, 198 Pac. 276, 14 A. L. R. 1450, and note, at page 1463.

The expense for services of a watchman of a mine may in some cases, depending always upon the facts, be allowed as annual assessment, but not unless a watchman is necessary. Where there is no machinery or other fixtures of importance, or where the fixtures and machinery are of such a character or condition as not to necessitate a watchman, the expense of a watchman will not be allowed. *Fredericks* v. *Klauser,* 52 Or. 110, 96 Pac. 679; *Gear* v. *Ford,* 4 Cal. App. 556, 88 Pac. 600. If there be machinery and fixtures on an unpatented mine, there must exist because of its exposed condition or its nature a necessity that it be watched and guarded before the expense of a watchman may be charged to annual assessment. Where such machinery and fixtures are all in buildings whose doors are locked, an occasional visit to them during the daytime is of little or no protection. If such property needs to be watched to prevent its destruction or theft, it should be watched by someone on the ground.

The occasional visits by P. H. Brady to the mines added very little protection, if any, to that secured by lock and key. That he depended upon the buildings being locked as full and complete protection is evident from his own statement as well as his con-

duct. In effect, he said he visited the property when he felt like it. If he felt good and like getting out he would go to the Times group "instead of taking a drive." His trips to the mines were more for pleasure than to guard or protect the property.

This court has gone as far or farther than any other court in allowing the expenses of a watchman as assessment work. *Kinsley* v. *New Vulture Min. Co.*, 11 Ariz. 66, 90 Pac. 438, 110 Pac. 1135; *Agard & Ingersoll* v. *Scott,* 13 Ariz. 165, 108 Pac. 460. In both of these cases there was evidence showing that a watchman or keeper was necessary to protect the property from being stolen or injured. In the first case, the expense was for a "keeper upon the property"; that is, a person who actually watched, protected and guarded the property. In the second case we take it the character of service was the same. In both the charge was for a "keeper" of the property. In both cases it was held the finding of the trial court on the issue of necessity was final. In the present case, as we see it, there is no evidence whatsoever showing the necessity for a watchman, but, on the contrary, the evidence is that no watchman was necessary, and none was in fact employed. A casual visitor to the property would not be a watchman or keeper of the property. *Wenzel* v. *Commercial Ins. Co.*, 67 Cal. 438, 7 Pac. 817.

In all the cases, so far as we are informed, where the expense of a watchman or keeper has been allowed as annual assessment, he has actually resided on the property and guarded it against intruders or wrongdoers who might steal or destroy it. It seems to us it extends the rule entirely too far to allow as annual work the expense of a watchman under the facts of this case. We reluctantly reverse the case, and would not do so if the services of a watchman had been needed to protect the property, or if in fact the services charged for were those of a watch-

man and tended in the least to develop the mines or aid in the extraction of ores therefrom.

Besides the payments for the watchman's services, there was evidence that Patrick Brady expended for labor of miners during the year, for pick and shovel prospecting and surface cuts and drifts on property, the sum of $257. The evidence does not disclose the particular claims upon which said work was done, or that as much as $100 worth of it was upon any one of the claims in the group. It follows that the expenditures for annual work were, after deducting $650 as watchman's expenses, far under $100 per claim, when applied to the group as it must be under the evidence.

The judgment quieting the appellee's title to six of the Times group as against appellant is reversed and the cause remanded, with directions to enter judgment for appellant.

LOCKWOOD and McALISTER, JJ., concur.