[Sac. No. 754.    Department Two. — August 2, 1901.]

## E. L. EMERSON et al., Appellants, v. R. S. McWHIRTER et al., Respondents.

MINING CLAIMS — LOCATION — POSTING OF NOTICES — NON-COMPLIANCE WITH LOCAL RULE — FORFEITURE NOT EXPRESSED. — In the location of a mining claim, the posting of only one notice of location, instead of two notices, as required by a local mining rule, cannot work a forfeiture of the location, when not expressly so declared in the mining rule.

ID. — ANNUAL WORK — RESUMPTION OF WORK — PREVENTION OF FORFEITURE — INVALID RELOCATION. — Without deciding whether the removal of water from a mine for the purpose of examining it with a view to sale can be considered as part of annual work, within the purview of the statute, where it appears that, after an affidavit of annual labor was filed December 27th, work was resumed in good faith before the end of the year, and was thereafter continuous, exclusive of Sundays, until the requisite amount of annual work was done, exclusive of the removal of the water, such resumption prevented a forfeiture; and a relocation made early Sunday morning, January 1st, was invalid, and conferred no right.

ID. — LIBERAL CONSTRUCTION AGAINST FORFEITURE OF MINING CLAIM — GOOD FAITH OF POSSESSOR. — Where a mining claim has been located, and work has been done thereon in good faith, and possession maintained without abandonment, the law should be liberally construed against a forfeiture thereof. Forfeitures of this class are deemed odious in law, and the courts are reluctant to enforce them.

ID. — BURDEN OF PROOF. — The burden of proof is upon the party alleging forfeiture of a mining claim for failure to do annual work, to establish it upon clear and convincing proof of such failure.

APPEAL from a judgment of the Superior Court of Tuolumne County and from an order denying a new trial.   G. W. Nicol, Judge.

The facts are stated in the opinion.

Crittenden Hampton, and J. P. O'Brien, for Appellants.

F. W. Street, and W. C. Kennedy, for R. S. McWhirter, Respondent.

Will M. Beggs, for Harry Argall and F. L. Argall, Respondents.

CHIPMAN, C. — Action to quiet title to a mining claim in Tuolumne County, called the Slap Jack Mine.

The court found the following facts: That one Coyle, on January 1, 1896, made a location of the claim in question, posted notice of his claim at one end of the claim, marked out the boundaries, and placed monuments at each of the four corners and at each end of the lode, and caused his notice to be recorded. By mesne conveyances plaintiffs and certain defendants, other than McWhirter, became the owners of Coyle's interest. A regulation of the mining district in which the claim in question is situated required two notices to be posted on the claim, " one of which shall be posted in a conspicuous place at each end of the claim." The court further found that plaintiffs did not do one hundred dollars' worth of labor or improvements on the claim for the year 1898; that on January 1, 1899, the claim was public mineral land, and open to location, and that defendant McWhirter on that day located the same as the Jim Blaine Quartz Mine.

Judgment passed for defendant McWhirter, and the appeal is from this judgment and from an order denying plaintiffs' motion for a new trial.

1. Defendant contends that Coyle's location was forfeited because he posted but one notice on the claim, whereas the local regulation required two to be posted. We waive the question whether defendant in this case can be heard to dispute the validity of Coyle's location. This court at an early day said: " The failure to comply with *any one* of the mining rules and regulations of the camp is not a forfeiture of title. It would be enough to hold the forfeiture as the result of a non-compliance with *such* of them as make non-compliance a cause of forfeiture." (*McGarrity* v. *Byington*, 12 Cal. 426.) Approved in *Bell* v. *Bed Rock T. & M. Co.*, 36 Cal. 214, where it was stated: " The failure of a party to comply with a mining rule or regulation cannot work a forfeiture, unless the rule so provides." Approved by the Arizona supreme court in *Rush* v. *French*, 1 Ariz. 99; *Johnson* v. *McLaughlin*, 1 Ariz. 493; also by Sawyer, J., in *Jupiter M. Co.* v. *Bodie Cons. M. Co.*, 7 Saw. 96; 11 Fed. Rep. 666. (See also *Flaherty* v. *Gwinn*, 1 Dak. Append. 509.) The Montana court declined to follow the California cases. (*King* v. *Edwards*, 1 Mont. 235.) We think, however, as was said by the Arizona court, that the cases cited announce " a safe and conservative rule of decision, tending to

the permanency and security of mining titles," and we see no reason for deviating from the decisions heretofore rendered on the point.

2. The remaining questions relate to the amount of the work done by plaintiffs during the year 1898, and to their resuming work in 1899. More than the requisite work was done for the period ending December 31, 1897, and it was found by the court that Coyle made a valid location. It appears from the evidence that one of the plaintiffs, E. L. Emerson, went to the mine in March, 1898, with five men, for the purpose of taking the water out of the principal shaft. This shaft was sixty-five feet deep, near the bottom of which was a drift or tunnel running off west from the shaft. The mine was unwatered down to the drift. Witness Emerson states in detail what he paid for the labor of the men, etc., amounting in all, including his own labor at $30, to $111.93. On cross-examination he stated: "I went there to take that water out. An expert was coming to examine the mine; therefore I took out the water, to clean it up, so he could see it." It took three days and nights to get the water out, and the balance of the time was spent in keeping it out. He testified that he took the water out "solely that the expert could see the mine, and if he reported it favorably, the mine was sold." Whether the expert came does not appear; the witness did not see him if he came. It does not appear that any work was done in the shaft or drifts except to pump the water out. In June following, plaintiff Britton, one of the owners, visited the mine, but did no work at that time. About October 11, 1898, he went to the mine with his partner, Emerson, and remained nearly one month, and lived in a house on the mine. One Elwell and his family were living in part of the same house. Witness and Emerson worked about three days in a shaft that had been previously started, — not the one formerly unwatered. Witness testified that they " sunk probably about three feet. It was picking ground, but hard, so we stopped it." This work was on the ledge, and with the exception of looking up the corners and cutting some brush, it was all the work that was done at that time. When they left, they posted a notice on the house and left one copy with Mrs. Elwell. On December 27, 1898, they filed with the county recorder an affidavit that they had done at least one hundred dollars' worth of work on the mine, stating, among other things, "Said labor consisted of

taking water out of the shaft, and work upon shaft and upon ledge. Said labor was performed during the year ending December 31, 1898." Witness Boynton testified that he went to the mine, December 30, 1898, under employment by the plaintiffs, and " worked there continuously, excepting Sundays," until January 25th, on which day he came away. He testified, positively, that he worked Saturday, December 31st. He bought his tools and supplies at Groveland, from a merchant named Cornwell, who testified that on Friday, December 30th, he sent them to the mine, which was two and a half miles distant. He was certain of the date, from circumstances which he related. January 1, 1899, fell upon Sunday, and Boynton testified that he did not work on that day, but resumed work on Monday morning, January 2d, and worked that day. He testified: " Excepting one stormy part of day, I worked; I worked the following days of the week. . . . Mr. Britton here worked with me twelve days. No one else. I was paid three dollars per day. I used an ax and shovel cutting brush, and in drift, pick and shovel." His wages amounted to sixty-three dollars, of which forty dollars was paid and twenty-three dollars was still due. Most of his work was in clearing away brush. Britton testified that he came on the 10th or 11th of January, 1899, and worked from that time on with Boynton; that Boynton was instructed to clear away the brush, the purpose being to fix the ground for a mill site; they worked together twelve and a half days. He testified: " When he worked with me, the character of the work was an open cut made over the ledge, near the shaft, and another open cut on the east end." He further testified that he examined the corners of the claim closely in January, before they quit work. On January 26, 1899, Britton made and filed with the county recorder an affidavit of labor performed, " consisting of excavating two open cuts, and draining tunnel and clearing off brush. One cut about average width of about five feet by fifty feet long on vein and seven feet deep, also an open cut on vein about six feet wide by two feet in depth by twenty feet long, . . . for the year ending December 31, 1898. Such expenditure was made by or at the expense of F. F. Britton and E. L. Emerson, for the owners of said claim, for the purpose of holding said claim." Appellant's evidence consisted of his own testimony, that of one Paul, and the man Elwell, who lived

on the mine. Defendant testified that he and Paul went to the mine on December 31, 1898, about two o'clock, P. M., and that he "did not see any one at work; did not see any evidence of work being done." They went around the boundaries, to the corners, and also to shaft No. 1 and 2 but saw no one working. He testified: "I was over a great portion of the location; there was a portion of that I would not want to go over. Mr. Paul told me this ground was open for location." Paul testified: "We went to corners, shafts, and all over it; went round boundary lines; examined monuments and posts; was there about one and one half hours. . . . I did not see anybody at work on the Slap Jack Mine during December 31st. If there had been any one there, we would have seen them." They returned between eleven and twelve o'clock that night, and sat around until a few minutes after twelve, when McWhirter posted his notice. Paul testified: "We waited for an hour or more, bid each other good by, and each went our way." Elwell testified that he first saw Boynton at the mine "the night of December 31st." Again: "Mr. Boynton came there December 31st. I don't know at what time he came. I don't know if he did any work; I was n't there. I got home about seven o'clock on the evening of the 31st." Again, he testified that he (witness) was not there on the 30th; that he was there only at nights, and not days, and usually came home about six or seven o'clock. Elwell's testimony cannot be received as in any degree contradicting Boynton on the point that the latter was at work on the mine December 31st. Nor do we think that the testimony of McWhirter and Paul necessarily raises a substantial conflict with Boynton's testimony on this point. Neither of them testified to having been at the place where Boynton said he was cutting out the brush, and where Britton said Boynton was clearing away for a mill site. This point was at a part of the mine not visited by McWhirter or Paul, and it is quite reasonable to suppose that Boynton worked as he testified positively he did, and yet not be seen by these men. They testified that they were there about an hour and a half, and that they hunted out all the corners and monuments of the claim and ran around the boundaries, which must have occupied most of this time. The negative fact that they did not see Boynton at work is not sufficient to raise a conflict in his positive testimony that he went there on December 30th, and worked cutting out brush on the 31st, corroborated as he is by

the testimony of the merchant who sold and delivered supplies to him on the mine on December 30th.

The evidence is undisputed that Boynton worked on Monday, January 2d, and thenceforward until Britton came, and thereafter the two worked together. The two worked, in all, $33\frac{1}{2}$ days, which, at three dollars per day, the wages paid Boynton, would make over one hundred dollars.

Respondent contends that the work done in unwatering the mine for the sole purpose of its examination with a view of sale was in no sense the annual assessment-work contemplated by the statute. It is unnecessary to decide whether respondent is correct in this view of the law. The case may be disposed of on other points. (See, on the question, 2 Lindley on Mines, sec. 629, and cases cited.)

3. Appellants contend that if it be held that their work in unwatering the mine cannot avail, they resumed work in good faith, and thus prevented forfeiture. The act provides that upon a failure to comply with the conditions as to doing the requisite work, the mine "shall be open to relocation in the same manner as if no location of the same had ever been made; *provided, the original locators, their heirs, assigns, or legal representatives, have not resumed work upon the claim after failure and before such location.*" (U. S. Rev. Stats., sec. 2324.) Plaintiffs Emerson and Britton worked for three days each in October, 1898, remaining at the mine nearly a month. Boynton went to the mine on December 30th, under instructions to resume work and continue it, and worked there on the 31st for plaintiffs; he rested the next day (Sunday), worked on Monday, January 2d, and thenceforward until joined by Britton, and they two worked together, completing the requisite one hundred dollars' worth of labor. The evidence shows entire good faith on plaintiffs' part in working the mine in 1898 and in resuming labor in 1899. Defendant McWhirter made his location on Sunday morning at about 12:15 of the clock. Plaintiffs were then in possession; they were in possession on Sunday, but rested from labor, as they had a right to do; they worked on Monday, and continuously thereafter until their labor amounted in value to over one hundred dollars. We think these facts show resumption of work within the meaning of the statute, and prevented forfeiture.

Where a valid location of a mining claim has been made, and work done thereon in good faith, possession maintained,

and no evidence appears from which an intention to abandon may be inferred, the courts should construe the law liberally, to prevent forfeiture. Indeed, this is the rule generally as to forfeitures.

The courts are reluctant to enforce a forfeiture, deeming this class of penalties odious in law; and it is well settled by decisions that forfeiture cannot be established, except upon clear and convincing proof of the failure of the former owner to have performed the labor to the amount required by law, the burden of proving which rests with the party asserting it. (2 Lindley on Mines, secs. 643 et seq.)

It is advised that the judgment and order be reversed.

Gray, C., and Smith, C., concurred.

For the reasons given in the foregoing opinion the judgment and order are reversed.

McFarland, J., Temple, J., Henshaw, J.

Hearing in Bank denied.