MIEHLICH et al. v. TINTIC STANDARD MINING CO.

No. 3730. Decided September 21, 1922. Rehearing denied December 30, 1922. (211 Pac. 686.)

1. MINES AND MINERALS—PARTIES PROPERLY LOCATING CLAIM PRIOR TO POSTING AND RECORDING OF NOTICE OF BOUNDARIES OF PRIOR LOCATORS' CLAIM HELD ENTITLED TO CONFLICT AREA. Where a notice of the location of a mining claim failed to describe the land claimed and no amended notice was posted and recorded describing the boundaries until after other parties had located a conflicting claim, the latter, having met all the requirements of the statutes relative to the holding of their claim, were properly awarded the conflict area, in an action brought under Rev. St. U. S. § 2326 (U. S. Comp. St. § 4623).

2. MINES AND MINERALS—EVIDENCE HELD SUFFICIENT TO ESTABLISH INCLUSION OF CONFLICT AREA IN MINING CLAIM BY STAKING AND MARKING ACCORDING TO CALLS OF LOCATION NOTICE. Direct and positive statements by a witness that he staked and marked a mining claim on the ground according to the calls of the location notice, which fixed the position of the claim very definitely, held sufficient to establish the inclusion of a conflict area therein, as against mere negative statements by subsequent locators that they saw no stakes thereon, and could have seen them if they had been placed there, though he made some statements as to directions and positions of stakes and boundary lines that did not exactly harmonize with the location notice.

3. MINES AND MINERALS—WORK ON ONE OF SEVERAL CLAIMS UNDER COMMON OWNERSHIP IN MOST PRACTICAL WAY SATISFIES REQUIREMENT THAT LABOR TEND TO DEVELOP EACH CLAIM. Work done on one of a group of contiguous mining claims under common ownership for the benefit of all in the most practical way, from the standpoint of an experienced and practical miner, to intercept veins and ore channels, satisfies the requirement of

Rev. St. U. S. § 2324 (U. S. Comp. St. § 4620), that the annual assessment labor tend to the development of each claim, despite testimony of expert geologists to the contrary, especially where the result is the finding of ores in large quantities, as the courts will never substitute their judgment for that of the practical miner acting in good faith while expending his money and labor for the development of a group of claims in furtherance of the government's purpose of developing the country's mineral resources.[1]

Appeal from District Court, Fourth District, Utah County; *Elias Hansen*, Judge.

Action by Joseph Miehlich and others against the Tintic Standard Mining Company. Judgment for plaintiffs, and defendant appeals.

REVERSED in part with direction and AFFIRMED in part.

*W. I. Snyder* and *Dan B. Shields,* both of Salt Lake City, for appellant.

*Baker & Baker,* of Provo (*Thos. Marioneaux,* of Salt Lake City, on rehearing), for respondents.

CORFMAN, C. J.

This action was brought by the plaintiffs against the defendant pursuant to section 2326, Rev. St. U. S. (U. S. Comp. St. § 4623), to determine the right of possession to certain conflict areas arising out of locations of mineral lands situate in Tintic mining district, Utah county, state of Utah. The plaintiffs claim the right of possession to the ground embraced within the exterior boundaries of their alleged Eagle, Black Eagle, and Black Eagle No. 1 lode mining claims, while the defendant claims the right to the possession of the ground within the exterior boundaries of its alleged Greyhound No. 2 and Greyhound No. 5 lode mining claims.

---

[1] *Mining Co.* v. *Spriggs,* 41 Utah, 171-179, 124 Pac. 770.

Under the pleadings and the proceedings before the court the case was one in equity. The trial court found for the plaintiff. On appeal to this court the defendant complains that the trial court's findings are not supported by the evidence, and that the judgment is contrary to law.

It is a conceded fact for the purposes of this case, and the trial court so found, that on January 1, 1911, the areas embraced within the defendant's Greyhound No. 2 and No. 5 lode mining claims were vacant, unoccupied mineral lands of the United States; that upon that day the defendant's agents entered upon said lands and discovered mineral in rock in place; that the minerals so discovered "were such as a reasonable prudent miner, not necessarily a skilled miner, would be justified in spending his time and money upon with the reasonable expectation of finding ore in paying quantities"; that thereupon discovery monuments were erected or repaired at or near the said mineral discoveries, respectively; that location notices were posted at or upon said discovery monuments, and that afterwards, in compliance with the law, said notices so posted were recorded in the office of the county recorder of Utah county, that being the county in Utah where said mineral lands are situated. The conflict areas that are in dispute between the parties to this action arise out of the subsequent or junior locations of the plaintiffs' mining claims, viz. the Eagle lode, located June 27, 1913, and the Black Eagle and Black Eagle No. 1 lodes, located January 1, 1915. The Eagle and Black Eagle lodes conflict with defendant's Greyhound No. 5, while the Black Eagle No. 1 alone conflicts with the Greyhound No. 2 lode. The trial court found from the evidence that all of the conflict areas in dispute between the parties rightfully belong to the plaintiffs, and rendered judgment quieting title in them as against the defendant.

With respect to the conflict area between the Greyhound No. 2 and the Black Eagle No. 1 lode, it appears that in the location of the former, on January 1, 1911, defendant's location notice posted and filed of record failed to describe the land intended to be claimed by the locators. Subsequently,

but not until after the plaintiffs had located the Black Eagle No. 1, defendant posted and recorded an amended location notice of the Greyhound No. 2 lode describing the boundaries of the claim as it was first intended to be located.

Under the circumstances the defendant concedes that, if a discovery of mineral was made in rock in place at the time when and place where a discovery monument was erected on the Black Eagle No. 1, then the judgment of the district court awarding the area in conflict between the Greyhound No. 2 and the Black Eagle No. 1 lodes to the plaintiffs was right, and should be affirmed.

Without going into details it is made quite clear that, in so far as proper discoveries of minerals have any bearing on the validity of the locations made of the respective mining claims involved in this action, the trial court's findings that all the discoveries made were sufficient, are amply supported by the record. It also appears from the record that since the initiation of the plaintiffs' right to the conflict area between the Greyhound No. 2 and Black Eagle No. 1 lodes under the foregoing circumstances plaintiffs have in all things met the requirements of both federal and state statutes relative to the holding of the Black Eagle No. 1 as a valid and subsistent mining claim, and therefore the judgment of the district court in plaintiffs' favor as to that conflict area should be affirmed.

Coming now to the area in conflict between the Greyhound No. 5 and the Eagle and Black Eagle lodes, the district court also decided that the plaintiffs' rights in the latter were superior, and should prevail. The trial court's judgment with respect to this conflict was predicated upon findings to the effect that the defendant in the location of the Greyhound No. 5 lode first failed to stake or mark its boundaries so as to include the land now claimed for it, and, secondly, the annual assessment labor thereafter performed did not tend to the development of the claim nor meet the requirements of the statutes.

The evidence beyond any dispute shows that on January 1, 1911, John Westerdahl and E. J. Raddatz, men of long and

varied experience in prospecting for minerals, and in the location of mining claims, entered upon the lands in question as the officers and agents of the defendant, and found valuable mineral in rock in place. That thereupon they erected or rebuilt an old monument as a discovery monument for the Greyhound No. 5, and placed thereon in a tin can a location notice descriptive of the claim reading as follows:

"Commencing at the location monument and running thence in a northeasterly direction to the northeast end center stake; thence southeasterly 300 feet to the N. E. cor. stake; thence southwesterly 1,500 feet to the S. E. cor. stake; thence northwesterly 600 feet to the S. W. cor. stake; thence northeasterly 1,500 feet to the N. W. cor. stake; thence southeasterly 300 feet back to the northeast end center stake, the place of beginning. The location monument of this claim is situated in a southeasterly direction, and a distance of 1,450 feet from the southeast corner stake of the Union B. claim, which is U. S. patent survey lot No. 5559. The northwesterly sideline of this claim is identical with the southeasterly end lines of the Great Carbonate Queen A, and Contact lodes, and its northeasterly end line joins the southern end lines of the Copper Queen No. 2 and Greyhound lodes. The mining claim above described shall be known as the Greyhound No. 5 lode."

At that time the ground was not staked, but with said location notice posted upon the ground, and within the time required by law, John Westerdahl again went upon the ground for the express purpose of staking or marking its boundaries. He was present at the trial and, as a witness in defendant's behalf testified on direct examination, quoting from the abstract:

"I staked the Greyhound No. 5 by putting cedar posts, four of them, one on each corner, and I staked the Greyhound No. 2 the same. Defendant's Exhibit 10 shows substantially the positions of the claims as we located them, and while there was a stake between two claims I marked the same stake. I can't remember whether I used patent corners or not; I marked the corners according to their positions."

Again, on cross-examination:

"I put up four corner stakes on the Greyhound No. 5, one at each corner. I don't remember putting any other stakes up. That is a long time ago. I have been in the country several times since, but I don't believe I have seen the corners, though. The location notices were already on the ground when I was putting up the

stakes. I don't know whether I had the copy with me or not. I fixed the corners as near as I could according to the way the notices read. * * * I got the distances where to locate from the location notices. I can't remember it now, more than according to the location notice, I did not measure the distance at that time. I determined where the corners of the Greyhound No. 5 were from the discovery notice."

Then again:

"I pointed out the discovery monuments to him (Busch) when he was there. I also pointed out to him where the corner stakes were. We found the patent corners of those claims, but I didn't look for any of the corner stakes that day. There should be a stake on the southeast corner which I placed there, and I showed him where it should be. There was a patent corner, and it is 600 feet across the corners. I put those stakes up in 1911. I can't remember exactly where the stakes were with reference to the two patent stakes. There was one patent stake on the southwest, and there was another patent stake on the other corner."

George Busch, a disinterested witness, testified:

"Knew of the Greyhound No. 5, and in 1913 I was out at the mine. * * * I had something to do with moving a discovery monument, or placing it on Greyhound No. 5. Westerdahl and I went there one day, and I noticed two or three stakes in particular were in bad condition, so I interested myself in re-establishing them. I recall the position of Greyhound No. 5 as being east of the Carbonate Queen, and I recognize the position of the Greyhound No. 5 on the map as approximately correct."

Again, on cross-examination:

"Westerdahl pointed out the ground and the corners. I did not look at the stakes; he pointed out where they were."

I. M. Snow, a civil engineer, who was a witness in defendant's behalf, testified that he went upon the ground as late as 1917 with Westerdahl for the purpose of making a survey of the property, and, although he did not then find any corner stakes on the Greyhound No. 5, "Westerdahl pointed out the position of the corner stakes, and they agreed very closely with the calls of the (location) notice."

It has been seen that the location notice of the Greyhound No. 5 lode fixes its position upon the ground very definitely and certainly. It is tied to the "southeast corner stake of the Union B. claim, which is United

States patent survey lot No. 5559. The northwesterly side line of this claim is identical with the southeasterly end lines of the Great Carbonate Queen A. and Contact lodes, and its northeasterly end line joins the southern end lines of the Copper Queen No. 2 and Greyhound lodes.''

If the direct and positive statements of the witness Westerdahl are to be believed, the exterior boundaries of the Greyhound No. 5 claim were staked and marked upon the ground according to the calls of the location notice. There is absolutely no evidence in the record to the contrary except the negative statements of those who subsequently located the Eagle and Black Eagle lodes to the effect that they were familiar with the locality, and that they had never seen any corner stakes on the Greyhound No. 5, and if corner stakes had been placed they would have seen them. It is true that upon cross-examination of the witness Westerdahl he made some statements with respect to directions and positions of stakes and boundary lines of the Greyhound No. 5 lode that do not exactly harmonize with location notice, but that should have very little weight, if any, as against his positive statements that the claim was staked and marked upon the ground in accordance with the call of the location notice. That the witness was confused, or that he meant different from what his words might imply, is not only made apparent from his positive statements as to how he staked the claim, but also by reason of his accurately pointing out years afterwards to the witnesses Busch and Snow the corners of the Greyhound No. 5 as now claimed by the defendant.

Passing to the question as to whether the trial court's finding that the annual assessment labor performed for the Greyhound No. 5 lode did not tend to develop that claim:

The record shows that at the time and since the location of the Greyhound No. 5 lode defendant was the owner of a group of undeveloped mining claims, some patented, others unpatented. By the location of the Greyhound No. 5 that claim became a part of the group. The claims, including the Greyhound No. 5, lie contiguous to each other. Presumably, at least, all the claims are mineralized, and if properly devel-

oped will produce valuable ore and in paying quantities. As to the amount of labor performed each and every year for the benefit of the Greyhound No. 5 since its location, there is absolutely no question. The question is: Did the work in the manner performed tend to the development of the Greyhound No. 5?

It must be conceded that under the plain provisions of section 2324, R. S. U. S. (U. S. Comp. St. § 4620), that where a group of mining claims are held in common ownership the assessment work may be done upon any one claim for the benefit of all, provided, of course, if the work really done inures to the benefit of each and every claim. In the present case the work was done on the defendant's Last Hope patented claim, a part of the group in which the Greyhound No. 5 is included, in a westerly direction, and approximately 2,000 feet from the latter. The work was done largely under the direction of the witness E. J. Raddatz. Regarding his qualifications to direct the work and his knowledge of geological conditions, he testified in part:

"I am 63 years old; am a mining man and operator, and have been for 43 years in Utah, Colorado, Nevada, California, and Old Mexico. Have prospected and located claims in Utah and Colorado, and have been familiar with Tintic for 30 years. Have been operating and interested for 13 years. Have studied the Tintic district carefully in its geological conditions and vein occurrences. Began operating in East Tintic in the fall of 1907, when I bought, located, and incorporated what is known as the Tintic Standard Mining Company, and have been operating there ever since without cessation. * * * I am president, general manager, and treasurer of the Tintic Standard mining Company, and have been so since 1907. In 1911, 1912, 1913, 1914, 1915, and 1916 I did work for the Greyhound, particularly in the year 1912. Exhibit 8 is my writing. My duties as manager from the years 1910 to 1916 and 1917 was the full direction of all work and development on the ground. Between the years 1911 and 1917 we did work through what is called shaft No. 1, sank near the north end of Last Hope claim, patented, and in 1919 we were working on the 1,000-foot level, drifting in a general east or northeast direction, and the same work was developing the Tintic Standard group of claims, including the Greyhound No. 5. We posted a notice that the work was done. * * * We were trying to develop a mine which would include all the claims we had. In the year 1914 we did safely $3,000 in work, which was

spent on the same level, and in my opinion it was well calculated to develop the Standard Company's property, including the Greyhound group, 2, 3, 4, and 5. The purpose of doing this work was to develop all the claims, including the unpatented ground. In the year 1915 we were sinking a winze on the 1,000-foot level, going from the 1,000-foot to the 1,200-foot level. We spent to exceed $3,000, and we had added 14 more claims, and, in my opinion, the work was developing all the property of the company, including the Greyhound group. It was done for that purpose, and it would. I am familiar with the surface of the Greyhound No. 5, and especially in the neighborhood of the points marked as first and second discovery; I had been over the ground several times before locating it. We started to work on the Standard in 1907, and I examined the property we had option on at that time. This ground was open to location many times, and in order to familiarize myself with the vein systems, and the ore occurrences, I was over it often. * * * I know of a porphyry dyke that starts from Greyhound No. 2 and runs in a general southwesterly direction. From there the Greyhound No. 5 passing very close west of the discovery monument on the Greyhound No. 5, I examined the property southwest of the notice, and I should say 400 or 500, perhaps 600 feet south of the monument, there is a gulch, coursing approximately east and west, which undoubtedly represents the fissure. There is a fissure within 75 or 100 feet of that. I think the fissure is at a point north of the point marked on defendant's Exhibit 10, 'Snow's Second Discovery.' I would call it pebble vein, and I have a sample from it in my overcoat which I took myself. It was in place. I am familiar with all the workings of the Tintic Standard Mine. We find a good many different kinds of material associated—porphyry, brecciation, pebble vein coming through the ore bed. *It is all one big mineralized zone through which the minerals run all the way from northwest, southeast, clear around to the northwest and southeast, varying practically 90 degrees, and the veins would run through the Greyhound No. 5. We have material in the Tintic Standard resembling the samples I got on the Greyhound No. 5, between the walls of porphyry.* I dug it out within the last couple of days." (Italics ours.)

The evidence given as to geological conditions of and the actual work done to find ore upon the defendant's group of claims is corroborated by other witnesses, particularly by the witness I. M. Snow. Moreover, this record shows that the result of the work performed in accordance with the judgment and under the direction of the witness Raddatz was the finding of ores in large quantities, in fact permanent mines of great wealth in continued operation.

As opposed to the defendant's testimony bearing upon the question whether the work done tended to develop the Greyhound No. 5 is the testimony of the expert witness R. H. Strickland, who gave it as his opinion that it did not tend to develop the Greyhound No. 5. He gave it as his opinion that there was some faulting between where ores had actually been found in the workings of the Standard Mine and the Greyhound No. 5, and geological conditions generally showed that the work done on the group did not support the defendant's contention that the work done tended to develop the Greyhound No. 5. In the light of what has been actually demonstrated in the extensive mine workings on the defendant's group of claims, it would seem the opinions of expert geologists ought not to be particularly persuasive in arriving at the fact to be determined. The evidence shows, and the trial court found, that during some years since the location of the Greyhound No. 5 the drifts projected from the shafts on the defendant's group of claims were in a northwesterly direction, and away from the Greyhound No. 5, and for that reason did not tend to develop the Greyhound No. 5. The trial court in making that finding or arriving at that conclusion seems to have lost sight of the fact that during those years the work, nevertheless, was actually done upon and within the confines of the defendant's group of claims; that all of the claims are in a mineralized country, and within the same mineral zone; that the most economical and practical way to develop their mineral resources was the sinking of shafts to attain depth and then run drifts in any direction in which there would be a likelihood of finding ore, not necessarily in the direction of every claim composing the group, but in any way that experience and good judgment of a practical miner would dictate in order to intercept ore veins or ore channels and attain a knowledge of underground conditions, and where deposits of ore are likely to be found. The mere fact that drifts are not projected from a shaft toward a particular claim some one year is no indication that ore channels, when found in some other claim, will not in course of time be followed or that they will not lead into that claim.

The very purpose of the government in granting mineral rights to the citizen is to have the mineral resources of the country developed. The statutes do not attempt to prescribe the manner in which work shall be done upon a mining claim in order to protect the miner's rights. If the labor tends to develop the mineral resources of the claim,        **3** that satisfies the law. Moreover, the courts will never substitute their judgment for that of the practical miner acting in good faith while expending his money and labor for the development of a group of mining claims, as have the trial court in this instance. 2 Lindley on Mines (3d Ed.) § 631; *Mann* v. *Budlong,* 129 Cal. 579, 62 Pac. 120; *Chambers* v. *Harrington,* 111 U. S. 353, 4 Sup. Ct. 428, 28 L. Ed. 452; *Smelting Co.* v. *Kemp,* 104 U. S. 655, 26 L. Ed. 875; *Mining Co.* v. *Spriggs,* 41 Utah, 171-179, 124 Pac. 770.

In *Mann* v. *Budlong,* supra, the California court says:

"A court will not be permitted to substitute its * * * judgment as to the wisdom and expediency of the method employed for developing the mine in place of that of the owner."

This court stands committed to that doctrine. In *Mining Co.* v. *Spriggs,* supra, Mr. Justice Frick, the writer of the opinion, that case being similar to the one at bar, said:

"There is some direct and positive evidence from expert miners and mining engineers in the record that the shaft and drifts as constructed tended to develop the whole group of claims, and that the work was also proper as prospecting work. We think the trial court was right in not substituting his own judgment for that of the mining men and engineers. The courts should be very slow, indeed, in holding that certain work is not calculated to develop certain mining claims or is not * * * prospecting work, when there is competent evidence that such is the effect of the work in question and where there is no evidence to the contrary."

Then, again, in the same opinion, it was held that, in this class of cases, with regard to forfeitures, quoting from *McCulloch* v. *Murphy* (C. C.) 125 Fed. 150—

"The rule is well settled that a forfeiture cannot be established except upon clear and convincing proof of the failure of the original locator to have work performed or improvements made to the amount required by law. The burden of proof to establish a forfeiture rests upon him who asserts it."

This case was tried to the equity side of the court, the court sitting without a jury. In our judgment the overwhelming weight of the evidence was that Greyhound No. 5 lode was staked or marked upon the ground in accordance with law. In fact there is no evidence to the contrary except the statement of witnesses for the plaintiffs that long afterwards they did not see the stakes, and that, owing to their familiarity with the locality, they would have seen them had such been there. Conceding their statements to be true, that is far from contravening the positive statement of the witness Westerdahl that he staked the ground in the first instance as required by law. That act, the staking or marking of the claim, having once been properly performed, completed a valid location of the ground. Thereafter it was not incumbent on the defendant as a matter of law to preserve the standing of the stakes against meddlesome persons or trespassers in order to preserve its rights as against subsequent locator seeking to acquire mining rights in the premises. In our judgment the record here is signally conclusive that the work done by it on its group of claims tended to and actually did develop the Greyhound Lode No. 5. If the uncontradicted statements of witnesses are to be believed, the defendant, by its work each year, was seeking to develop its group of claims in the most practical way from the standpoint of an experienced and practical miner, that of sinking shafts to great depth, and from thence running drifts to intercept veins and ore channels known not altogether theoretically from the standpoint of so-called experts, but actually demonstrated and brought to light by the use of powder and steel in the hands of labor.

Again, we are of the opinion that, if the trial court entertained any doubt as to either of the propositions we have discussed, it at least might have, upon the timely showing made by the defendant, permitted the case to have been reopened for the receiving of newly discovered evidence of the most convincing kind to the effect that the Greyhound No. 5 had been staked as claimed for it, and that the work performed

by the defendant on its group of claims tended to develop the mineral resources of said lode.

For the reasons assigned, we are of the opinion that the judgment of the district court awarding the conflict area between the Greyhound No. 5 and the Eagle and Black Eagle lodes to the plaintiffs was wrong, and should be reversed, vacated, and set aside and the court directed to enter judgment therefor in defendant's favor. As to the conflict area between the Greyhound No. 2 and Black Eagle No. 1 lodes, the judgment of the district court awarding that to plaintiffs should stand affirmed. Each party to pay his own costs.

It is so ordered.

WEBER, THURMAN, and FRICK, JJ., concur.

GIDEON, J. (concurring).

Two questions of fact are presented by the record, and findings were made by the trial court upon these issues: (a) Was there a valid location of the mining claim known as Greyhound No. 5, and, if so, did the boundaries as marked upon the surface of the ground conflict with the boundaries of the Eagle and Black Eagle? (b) Did the labor and development work done on the part of the defendant company tend to develop the mining ground in controversy, and could the work and labor be applied as the annual assessment work? The trial court found both issues against the defendant. It is indisputable that there is testimony in the record to support such findings. A finding against the defendant on either issue defeats its claim to the conflicting area. The trial court heard the witnesses, had before it elaborate maps showing the geological formation of that neighborhood and the opinion of experts on the question as to whether the work done by the defendant tended in any way to develop the mining claims in question. In my judgment the testimony supporting the district court in its findings on both issues is equally as strong as, if not stronger than, the testimony produced in opposition thereto; but the other members of the court are of a contrary view, and, as the result depends upon facts deducible from

the evidence only, I yield to their judgment, and therefore concur in the result.