# UTAH STANDARD MINING CO. v. TINTIC INDIAN CHIEF MINING & MILLING CO. et al.

No. 4543.   Decided January 7, 1929.   (274 P. 950.)

*Claude F. Baker,* of Eureka, for appellants.

*W. L. Hoyt,* of Nephi, for respondent.

RITCHIE, District Judge.

This action was brought in the district court of Juab county by the plaintiff to quiet its title to 10 unpatented mining claims, which are referred to as the "A. B. C. group." The sufficiency of the locations made by the plaintiff is not challenged, except as to the question whether the property covered by these locations was open to entry at the time the property was located by the plaintiff. The defendants, in a counterclaim set up by them, alleged that prior to the date of the locations by the plaintiff the defendants and their predecessors had located 22 mining claims, designated as the Tintic Chief, Tintic Chief Nos. 1 to 22, inclusive, part of the area which is covered by the plaintiff's locations.

The sufficiency of the defendants' locations is not challenged by the plaintiff, and the court found that the locations made by the plaintiff and defendants, respectively, were sufficient and were made in all respects in conformity with the law. The defendants further allege that they have been continuously in possession of said 22 claims and have performed the annual assessment work required by law. The plaintiff denies that the annual labor for the year 1923-24 was performed on said claims by the defendants.

The plaintiff in its brief alleges that the only point for the court to determine is: "Did the defendants, during the year beginning July 1, 1923, and ending July 1, 1924, do $2,200 worth of work on, or for the benefit of, their alleged mining claims?" The defendants' brief states the issue in the following language: "One point only is in issue here, and for the court to determine, and that is: Was the assessment work covering the year during July 1, 1923,

to July 1, 1924, proven not to have been performed by clear and convincing evidence in the case?"

The defendants filed an amended answer and counterclaim to quiet title to the defendants' 22 Tintic Chief claims. The plaintiff's reply alleges in substance a forfeiture of the defendants' rights through failure to perform the annual labor for the year from July 1, 1923, to July 1, 1924. The case was tried in January, 1926, ending on January 20th. Trial was had on the equitable issues only; that is, on plaintiff's fourth cause of action, defendants' amended answer and counterclaim, and plaintiff's reply to the amended answer and counterclaim. During the trial plaintiff's complaint was amended by a detailed description of an area covered by plaintiff's 10 claims, ultimately reduced to 9. The area in question is at Riley Springs, a few miles south of the Tintic mining district, several miles east of Jericho, a siding on the Los Angeles-Salt Lake Railroad. The railroad maintains a head tank to collect the spring water which is piped west of Jericho. The sections in and around the claims are unsurveyed; so the lode claims of each litigant are tied to this head tank. Both groups of claims were marked on the ground with substantial monuments, and notices of location were duly posted and recorded, and on each claim there is a sufficient discovery of mineral at or near the respective discovery monuments. On the issue of assessment work, plaintiff introduced evidence to the effect that the workings on the defendants' claims appeared old, and different witnesses from some unknown time in December, and at periods thereafter, saw no one working these claims. The defendants claim that the period from July 1, 1923, to the unknown time in September, 1923, was not covered in any manner in plaintiff's testimony, is substantiated.

The locators of plaintiff's claims admitted that when they located them, in July, 1924, they had knowledge of records affecting the area, of claim stakes, and location notices on the ground; that there were numerous workings

on the ground; that there was a frame cabin with living equipment and mining tools at the large tunnel. Defendants then introduced evidence that the assessment work for the year from July 1, 1923, to July 1, 1924, was done principally in the following two places: One in the large tunnel on the Tintic Chief No. 3, consisting of 75 feet of tunnel work; and the other on a road leading to the claims, consisting of 2 miles of road improvement. Experts called by defendants testified that the tunnel work was worth $25 per foot and $30 per foot; that the tunnel work was exceptionally difficult mining, for the 75 feet involved. Expert witnesses also testified that the road work was worth from $650 to $900 for the work done during the assessment work. They testified that the tunnel work and the road work were necessary for the development of the claims. Plaintiff offered no testimony to rebut the above testimony, except the statement by Clyde. Laura Lewis, one of the defendants, testified positively that she spent over $3,000 on the claims, in improvement and work for the period in question, and spent more money than the assessment required, because the defendants wanted to develop the property and get a mine. Plaintiff did not produce any witness who testified as to the quantum of the improvements on defendants' claims on July 1, 1923, and that this quantum was not enhanced the statutory amount during the year in question.

It is asserted by the plaintiff that it was incumbent on the defendants to prove that during the year 1923-24, the obligation was upon the defendants to do $2,200 worth of work for the benefit of the 22 mining claims. There was a sharp conflict over this question of the value of the work at this place. One of the witnesses placed it at $25 per foot, which would make its value $1,555, and another places the value at $30 per foot, making a value of $1,866. Now, without discussing at this moment the question of the value of the work, the important thing to note is the finding of the court that there was 62.2 feet of work done, which at the

minimum of $15 per foot amounted to the undisputed value of $930. This amount, by the undisputed testimony, and by the findings of the court, stands to the credit of the defendants upon the work for the disputed year. This means that the defendants have done enough work for that year to cover the annual labor for at least 9 claims.

There is no principle of law that we are aware of which asserts that, if the owner of a group of 22 claims undertakes to do the annual work for that group, as a consolidated group, and performs only the labor necessary for 9 claims, he loses the benefit of that work on 9 claims, provided it is in fact performed on one of the 9 claims in such a way as to benefit the remaining 8, as well as the one upon which performed. In this case what is called the "big tunnel" is located on Tintic Indian Chief Claim No. 3, and projects slightly into the territory of Tintic Chief No. 2. The work was performed upon the claim which seems to have been the most important one of the group. Inasmuch as the defendants indisputedly performed the work on this claim, they cannot lose the benefit of it.

While the burden was upon the plaintiff to prove that the defendants had forfeited their rights by failure to do the statutory quantum of improvements during the year in question, the defendants proved by affirmative evidence that they performed 75 feet of work in the big tunnel. According to the uncontradicted testimony of witnesses on behalf of the defendants, the tunnel work was worth from $25 to $30 a foot.

Robert A. Wilkins testified that his age is 38; that he was mining engineer for the Iron Blossom, and working now for the Knight Investment Company and Tintic Standard Mining Company; that he is chief mining engineer for all the Knight mines in Tintic. "I would say that $25 per foot would be a reasonable contract price for the tunnel in 1922. I arrived at the footage for 1923 by having the men who did the work point out the markings in the tunnel. The reasonable value per foot for the tunnel work in 1923 is

$25 per foot. The work done by the defendants in the tunnel in 1922 and 1923 had a tendency to develop the lode or lodes which traverse the entire group of the Tintic and Indian Chief claims, and that is what mining men try to do, and is their objective. My attention was directed to the 2 miles of road to the connection, and I made an inspection of it. As chief engineer of the Knight Investment Company I have had roads contracted and constructed during the past few years. Two men and a team will probably accomplish 200 feet per day on that road. The work was probably 10,000 feet, nearly 2 miles, and probably would require 50 days' labor wtih two men and a team. A team and man would be worth $8 per day, and an extra man $5 per day probably $13 a day. That would be $650 for the reasonable worth of the road improvements. That road work certainly had a tendency to improve and develop defendants' claims. In my experience, I would consider this absolutely necessary assessment work."

J. W. Moore, called by the defendants, testified that he is 62 years old; has had 25 to 30 years' experience in mining. He stated in much detail, describing the Tintic Chief mining claims in question, that he knows the condition of the ground he went through in the tunnel, and its distance from marker. The big tunnel was started in June, 1922. After describing the work done after July 1, 1922, on claim No. 2 and claim No. 13, and in January, 1923, on No. 2 and in another tunnel on No. 14, he says that after July 1, 1923, during 1923, he and C. D. Mahoney did between 75 and 78 feet of additional work in the big tunnel on Tintic Chief No. 3, for the Tintic Indian Chief Mining Company. They were sent out by Mrs. Lewis. The reasonable value of that work, done between July 1, 1923, and October 25, 1923, was $30 per foot. Wayne Lewis and Mark Lewis assisted in measuring up this work. He made a mark in the tunnel with a pick, and smoked it with a candle, so he could tell where he started work in the tunnel on July 1, 1923. It took 85 sticks of 7-8 powder per foot. This is hard mining. Had

to single jack there. Had no compressors. Worked full hours, and sometimes overtime, in 1922, and 1923. He states in some detail about the road, and that the Lewis boys constructed about 2 miles of road from July 1, 1923, to October 25, 1923. "In my opinion as a mining man, those 2 miles of road constructed by the Lewis boys in 1923 had a tendency to develop and promote these claims. In my opinion those 2 miles of road work were reasonably worth between $400 and $500 per mile."

Wayne Lewis, called for the defendants, testified: He was 19 years of age; son of Laura Lewis and Oran Lewis, deceased. He says: "I know where work started in the big tunnel on July 1, 1923, and the point they quit work in the latter part of October, 1923. We measured 75 feet of tunnel work that they did during that period. It was a little more than that, but that is what we called it, 75 feet. My brother and I built the 2 miles of new road that summer and fall of 1923, after July 1st." He described with much detail how and where the work was done. He says: "We had a team there all summer, a wagon and tongue scraper, and ordinary hand tools; we had a grub hoe and two or three picks and shovels. We didn't work just 8 hours; we generally started in the morning and quit about 6 or 6:30 at night; it was very hard work."

M. A. Long, a witness called by the defendant, testified that he was 53 years of age; that he is a miner and followed mining for 33 years; is a stockholder of the plaintiff. He worked in the big tunnel on the claims in question in June and July, 1925. He states: "In my opinion as a miner the fore part of the tunnel, the first 200 feet in is worth about $30 a foot, the next 50 about $20, the next 50 about $10, and from there on it would average about $25. I considered the last part of the tunnel worth $25 a foot, under the conditions I was working."

Richard W. Money, called by defendants, testified that he is 44 years old; that during the past 15 years has been engaged in road building; was county supervisor of Utah

county for 12 years, and then was moved from there to state road agent. "Have been over the road from Silver City, Lynndyl road, to the claims in question, eight times during the past 2 or 3 years. I am familiar with the new stretch of road between the Silver City-Lynndyl road and the old county road. This new stretch is about 2 miles to 2½. The reasonable worth of that improvement is between $800 and $900, in my opinion."

Laura Lewis, called as a witness for the defendants, stated: " I spent over $3,000 directly upon the claims in improvements and work for a period from July 1, 1923 to July 1, 1924. My husband died in 1922. I am a widow, 60 years of age. The reason we spent more than was required in 1923 is that ever since we have had our claims our object has been to develop the property, and we have spent all we could get hold of, and all we could earn, and all the family could earn. We wanted to get a mine there. We have spent every year over $3,000, except in 1924."

A. W. Clyde, president of plaintiff company, testifying for plaintiff in rebuttal, among other things, stated that in a conversation with Mrs. Lewis in July, 1924, she stated that she had failed to have the work done, and offered to pay us "for a relinquishment." Mrs. Lewis denied this, stating, "I never told Clyde, in substance or effect, or at all, at that time, or at any other time, that I had failed to do the work on the claims."

Arthur Trantor testified that in 1922 and 1924 he came up from Jericho to the old county road, and crossed to the Miller farm, and could see no signs of improvements. "The road I traveled followed a pipe line part of the way. You can't stay on that road all of the time. They keep changing the road in that country every year."

A. W. Clyde, testified: He is a resident of Nephi, Utah, president of the plaintiff company, and one of the locators of the plaintiff's claims; that he is familiar with the claims.

He described the locations made by him on July 1, 1924; testified that he saw the tunnel called the big tunnel on July 1, 1924, which he later determined to be more than 100 feet in length.

Roy Burraston, called by the plaintiff, testified that he resides at Goshen, Utah, is a stockman, and rides the range a good deal the year round; he is familiar with the cabin on the claims, and the ground adjoining; never saw anybody on the workings between July 1, 1923, and July 1, 1924; is familiar with the tunnel and the old dump, and was at the tunnel and dump October 15, 1924, but no one was working at that time, and no signs of recent work. He noticed some tools there; was there in October, 1923, riding for cattle; saw no signs of work, no one at the cabin, and no signs of any one having camped there; was in the cabin; signs indicated it had not been occupied recently. In June, 1923, there was some one at the cabin. "I was there along in the late summer, it might be September; saw no one on the property; did not camp at the house. I was there about June 1, 1924. I went to the house, and no one was there; the only signs I noticed was that some one had camped near by with several horses. It looked like they had camped a long time not far from the house. I rode to the shaft, and also to the tunnel (meaning the big tunnel), but no one was there. I did not go into the tunnel." On cross-examination the following questions were asked and answered: "Q. Why do you change your statement? You testified that you went down to water your stock September, 1923, and you did not go near the camp? A. I didn't stop to ride up through the country. There were no tracks around the cabin. I was not through that country between June and September, 1923."

A. H. Dennis testified that he resided at Park City, is a miner, and familiar with the A. B. C. group of claims near Riley Springs; helped to locate the ground in company with Mr. Clyde; testified concerning the character of the

ground and to Clyde and himself staking the first four claims July 1, 1924; did not go to the house. The ore looked good. Staked the four claims; mineral in place on each claim. On July 9, Bean and the witness located the other claims in similar manner to the first four; mineral in place on each claim. Were right by the tunnel, and 100 feet or so from the house. Noticed no smoke and no tracks.

George Bean, called by the plaintiff, resides at Nephi, Utah; raises sheep; familiar with the country around Riley Springs. During early winter of 1923 and 1924 had sheep near Riley Springs, getting water at the springs. Knows the location of the A. B. C. group. Saw no one at the house or in the vicinity during these trips; watered about 100 yards from the house; was there about April 25, 1924, until the last of May, right west of Riley Springs. No one there at that time. Went into the tunnel (the big tunnel) in the spring of 1924. No signs of recent work.

Spencer Tolley, called by the plaintiff said he knows where Riley Springs is, and the cabin by the head tank there; was in that vicinity during the winter of 1923 and spring of 1924, chopping posts; was there five or six times before New Years, hauling posts; camped at the house for about three trips and watered at the springs. There were no signs of having been recently occupied. Has been past the tunnel, but not in it.

Harvey Salisbury testified that he was with Spencer Tolley during the winter of 1923 and 1924, hauling posts, for six or eight trips at Riley Springs; saw no one working there; camped 50 or 100 feet north of the cabin; no signs of recent occupation.

Thomas Salisbury testified he is a brother of Harvey Salisbury; was at Riley Springs during the winter of 1923-24 with his brother and Spencer Tolley, getting posts. No one occupied the house, and no one there; no signs of it being occupied; did not go to the tunnel.

A. W. Clyde, recalled, testified he and Bean have conveyed their interest in the claims to the plaintiff, he and Bean were the sole locators of the ten claims. Worked in the tunnel on the A. B. C. No. 3; all work was done in the tunnel; the company expended around $1,500. The witness is president of the plaintiff company; his wife is treasurer; Jim Bean is vice president; W. L. Hoyt, secretary and counsel.

James Bean, called by the plaintiff, testified that he is one of the locators of the A. B. C. group. He is in the sheep business and farming; 48 years old; assisted in staking the claims July 9, 1924; been on ground frequently before. No one living at the cabin in the spring of 1923, nor in October, 1923, when he was camped 2½ miles from the spring, but getting water at the spring. Did not go to the tunnel. The shack is located on A. B. C. No. 10; never saw any one working on the ground within its locations in the spring of 1924 or fall of 1923; is familiar with all that ground.

E. B. Sperry, county recorder of Juab county, testified to a deed of record in his office of A. W. Clyde and James Bean to the Utah Standard Mining Company, a quitclaim deed of the interest of the locators to the plaintiff of all the A. B. C. claims.

J. H. Carter, called by the plaintiff, testified that he resides at Nephi, Utah, is a civil and mining engineer by profession, familiar with the railroad head tank at Riley Springs; knows the corners of the A. B. C. No. 10 mining claim; has recently made a survey to tie the corner of that claim to the railroad head tank. The tank bears north 27° 25′ east, 694.3 feet from the southwest corner of cabin No. 10; made a map of the A. B. C. group. By tying to that corner, and allowing each claim to be 600 feet easterly and westerly, and 1,500 feet northerly and southerly, he can give a description of the group; he has the course of the westerly boundary of A. B. C. No. 10 as staked on the ground. On voir dire he testified that he determined the course and length of the westerly side of No. 10; it was 1,105.8 feet long. The only surveying he did with respect

to the boundaries of the A. B. C. group was to survey the western side of the A. B. C. No. 10 claim.

On direct examination the following question was asked: "Q. Tying the A. B. C. group of mining claims with the head tank, and assuming these claims are as stated in my hypothetical question, about 600 feet in width, and 1,500 feet in length, and arranged as I have referred to them, and as illustrated on Exhibit A, will you give the exterior boundary of the A. B. C. group of claims." Over defendants' objection the witness testified to boundary description of the group, stating the group contained in all 201.18 acres of land. On cross-examination the witness testified: "I have not tied the head tank to any section corner. Sections are unsurveyed there. The southerly end line of A. B. C. No. 7 does not touch the southerly end line of A. B. C. No. 3, but touches it about 100 feet west. I have been told by officers of the company that the corner No. 7 was 100 feet west of the common corner, so that throws this out 200 feet to the east of the side line of Nos. 5 and 6 claims. Have never run the line myself." Witness did not conform his description to the notices of location on the A. B. C. group of claims; he never saw the notices of location. He never saw the notice of location of No. 7. Witness surveyed the tunnel, the first time being in March, 1925, and gives details as to the result of his survey at that time.

One fallacy and misconception of the rules of mining law appears at the inception of the case. It is stated by plaintiff's counsel as follows: "The only point for the court to determine is: 'Did the defendants, during the year beginning July 1, 1923, and ending July 1, 1924, do $2,200 worth of work on, or for the benefit of, their alleged mining claims?"

While the conflict area is difficult to determine with anything like precision from the pleadings, the evidence, or the decree, it is sufficiently certain that the south line of the plaintiff's group of claims, No. 6 A. B. C., No. 3, and No. 8, which are coterminous and continuous (excluding

No. 7, which was not surveyed and not considered or included in the findings, conclusions, and decree), constituted the south boundary of the conflict area, and is at least 500 feet above the north line of defendants' claims, Tintic Chief Nos. 17, 8, 9, and 10. Below these four Tintic Chief claims, 17, 8, 9, and 10, and still further away from the conflict area, are Tintic Chief Nos. 22, 18, 19, 20, and 21. Thus Tintic Chief claims Nos. 17, 8, 9, 10, 19, 20, 21, and 22, are unquestionably south of and outside of the conflict area involved in this case some of them far removed from it. In other words, 9 of the defendants' 22 claims are unquestionably entirely outside of the conflict area.

The plaintiff in the situation of the plaintiff company here, has no concern as to whether or not such 9 claims have ever been located, established, or worked upon during the year in question, or any other time. It is no affair of his. So far as he is concerned, the government of the United States only can raise that question. It is a serious question also, whether 3 other of the defendants' claims, Tintic Standard Nos. 12, 5, and 15, on the north side of the conflict area, are in any part included in the conflict area, although apparently a very small portion at the south end of each of the latter three claims, Nos. 12, 5, and 15, is included in the conflict area; so, far the sake of the argument we will assume that they are included in it to that extent.

So the conflict between plaintiff's 9 claims (excluding No. 7) is asserted in fact only against 13 claims of the defendants. Therefore $1,300 worth of annual labor performed for the benefit of the defendants' claims during the year in question would be sufficient. The laws of the United States provide that:

"Until a patent has been issued therefor, not less than $100 worth of labor shall be performed, or improvements made during each year." And further provide that: "But where such claims are held in common, such expenditure may be made upon any one claim." Rev.

Stat. U. S. § 2324; 30 U. S. Code Anno. § 28, p. 151; 1 Snyder on Mines, § 498, p. 470.

This section provides:

"That labor required by the statute may be performed on or off a claim or group of claims so that it tends to develop and to facilitate the extraction of ore, and may consist in any act or work necessary for that purpose, whether it be the running of a tunnel, sinking a shaft, constructing a road in certain cases, the constructing a ditch to convey water or carry off debris, or in short any act, work or improvement which will in its natural and obvious effect enhance the value of the claim and tend towards its development and facilitate the extraction of the minerals it contains. That where claims are held in common, which means a community of interests, and it would be more equitable in the operation thereof to work them as a group, work may be done on one claim for the benefit of all, or may be done entirely off all the claims, as running a tunnel or procuring water, or the like."

These contain the substance of the provisions of law governing this question. There is no enactment of Congress, nor the decision of any court which we have been able to find, inconsistent with the statement above made, that the actual work on 13 claims of the defendants, under the evidence in this case, is sufficient to maintain the rights of the defendants intact. In order for the plaintiff to maintain any right because of the locations it relied upon, it is necessary that it establish that the prior rights of the defendants were forfeited by the failure of the defendants to perform the annual labor for the year 1923-24.

Referring to the Miehlich Case, 60 Utah 570, 211 P. 686, the Supreme Court of this state, quoting from *McCulloch* v. *Murphy*, (C. C.) 125 F. 150, says:

"The rule is well settled that a forfeiture cannot be established except upon clear and convincing proof of the failure of the original locator to have work performed or improvements made to the amount required by law. The burden of proof to establish a forfeiture rests upon him who asserts it." *Miehlich* v. *Tintic Standard Mining Co.*, 60 Utah 569, 570, 211 P. 686, 690.

The Supreme Court of California has held:

"Where a valid location of a mining claim has been made, and work done thereon in good faith, possession maintained, and no evidence appears from which an intention to abandon may be inferred, the courts should construe the law liberally, to prevent forfeiture. Indeed, this is the rule generally as to forfeitures. The courts are reluctant to enforce a forfeiture, deeming this class of penalties odious in law; and it is well settled by decisions that forfeiture cannot be established, except upon clear and convincing proof of the failure of the former owner to have performed the labor to the amount required by law, the burden of proving which rests with the party asserting it. 2 Lindley on Mines, § 643 et seq."

*Emerson* v. *McWhirter*, 133 Cal. 510, 516, 65 P. 1036, 1038. See also, Judge Sawyer's opinion in *Jupiter M. Co.* v. *Bodie Cons. M. Co.*, (C. C.) 11 F. 666, 7 Sawy. 96.

In 1906 the Supreme Court of California approved this doctrine in *Gear* v. *Ford*, 4 Cal. App. 556, 88 P. 600, thus:

"The courts are reluctant to enforce forfeitures, deeming this class of penalties odious in law, and it is well settled by decision that forfeitures cannot be established except upon clear and convincing proof of the failure of the former owner to have performed the labor to the amount required by law, the burden of proving which rests upon the party asserting it. *Emerson v. McWhirter*, 133 Cal. 510 [65 P. 1036]."

The same rule is asserted by the Supreme Court of Utah, quoting *McCulloch* v. *Murphy* (C. C.) 125 F. 150, *Miehlich* v. *Tintic Standard Mining Co.*, 60 Utah 569, 211 P. 686. See, also, *Nevada Exploration & Mining Co.* v. *Spriggs*, 41 Utah 171-181, 124 P. 770. The court cites, as to the same effect, *Hammer* v. *Garfield M. & M. Co.*, 130 U. S. 291, 9 S. Ct. 548, 32 L. Ed. 964; *Upton* v. *Santa Rita M. Co.*, 14 N. M. 96, 89 P. 287.

The conclusion is that, accepting the finding of the trial court that the defendant performed 62.2 feet of work in the tunnel for the year, in question, and placing a value thereon of $15 per foot, made in the court's finding, to total value being $930, the defendant performed enough work to do

the annual labor on 9 claims out of the 13 involved in the conflict area.

For the reasons stated, the judgment of the trial court is reversed, and the cause remanded to said court, with directions to grant a new trial, at respondent's cost.

THURMAN, C. J., and STRAUP, CHERRY, and GIDEON, JJ., concur.

HANSEN, J., being disqualified, did not participate herein.